UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| SHARON BROWN WILLIAMS, | ) | Civil Action No.: 4:11-cv-0429-RBH-TER |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| -vs- | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| HORRY-GEORGETOWN TECHNICAL | ) | |
| COLLEGE, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## I.    INTRODUCTION

In this discrimination action, Plaintiff, who is proceeding pro se, alleges that Defendant

discriminated against her because of her race in violation of Title VII of the Civil Rights Act of 1964

(Title VII), 42 U.S.C. § 2000(e) et seq. and because of her age in violation of the Age Discrimination

in Employment Act (ADEA), 29 U.S.C. § 621 et seq.  She also alleges that Defendant retaliated

against her for engaging in protected activity in violation of these statutes.  Plaintiff also asserts state

law claims for defamation and violation of S.C. Code Ann. § 1-13-80(A).  Presently before the Court

is Defendant's Motion for Summary Judgment (Document # 91).  All pretrial proceedings in this

case were referred to the undersigned pursuant to the provisions of 28 U.S.C. § 636(b)(1)(A) and (B)

and Local Rule 73.02(B)(2)(g), DSC.  Because this is a dispositive motion, this Report and

Recommendation is entered for review by the district judge.

## II.    FACTS

Plaintiff was hired by Defendant (the College) as an adjunct faculty instructor.  She taught

during the Fall 2008, Spring 2009, Summer 2009, and Fall 2009 semesters.  Letters of Appointment

(Ex. A to Def. Motion); Pl. Dep. 79; Pl. Sec. Dep. 88-89. At the time of Plaintiff's hire, she was

fifty-nine years old, possessed a Bachelor's degree in English, a Master's degree in Education, and

a South Carolina teacher certification for elementary education.  Pl. Depo. 39-40. Plaintiff taught developmental reading and developmental English courses.  Pl. Dep. 77. As an adjunct faculty member, Plaintiff was employed from semester-to-semester, and could be assigned to teach courses at any of College's campuses.  Letter of Appointment; Adjunct Faculty Job Description(Ex. B to Def. Motion).

During Spring 2009, Plaintiff was also employed as a tutor in the College's Student Success and Technology Center (SSTC). Tutor Letter of Appointment(Ex. C to Def. Motion). The SSTC program is designed to help remediate students who wanted to attend college, but were not fully prepared. The College decided to restructure personnel within the SSTC department, and in June 2009, it advertised for the position of SSTC Coordinator.  Coordinator Posting(Ex. D. to Def. Motion); Pl. Sec. Dep. 62. The posting listed the following minimum qualifications:

> Bachelors degree in English, Communications, or related field and excellent customer service and communication skills. Computer and Microsoft Office 2007 proficiency required. Position requires strong organizational skills, and ability to work with minimal supervision.

Id.  Plaintiff applied for the position by submitting an application for employment. Application for Coordinator position(Ex. E. to Def. Motion); Pl. Sec. Dep. 44.

Peggy Smith, Assistant Vice President for Academic Affairs, and Jennifer Riddei, SSTC Director, interviewed the applicants for the Coordinator position, including the Plaintiff.  Pl. Sec. Dep. 45. Notes of Plaintiff's interview indicate that Smith and Riddei believed that Plaintiff's responses to interview questions were inadequate, and they also learned that Plaintiff was not proficient in Microsoft 2007. Interview Questions and Feedback forms (Ex. F to Def. Motion). Additionally, Plaintiff failed to complete a timed-technology assessment at the conclusion of the interview.  Assessment Directions and Plaintiff Results (Ex. G to Def. Motion); Pl. Sec. Dep. 47.

Kimberly Shegog also applied for the Coordinator position, and she had a Bachelor's degree

in English Literature, eight years customer service experience, tutoring experience, and was pursuing a Master's degree in English.  Shegog Application (Ex. H to Def. Motion). Notes of Ms. Shegog's interview indicate that she had "great listening skills," and was sufficiently knowledgeable in Microsoft Office 2007, as she completed the timed technology assessment. Shegog Interview Feedback forms (Ex. I to Def. Motion); Shegog Assessment Results (Ex. J to Def. Motion). Ms. Shegog was ultimately hired for the Coordinator position.

In July 2009, the College advertised a position of Counselor within the Educational Talent Search (ETS) program. Counselor Posting (Ex. K to Def. Motion). The department specific minimum qualifications included:

> Master's degree. Masters degree in Counseling, Student Personnel Administration, Social Work or closely related field with significant coursework in counseling preferred. Two years progressively responsible work experience in a secondary or college/university setting preferred.

Id.  Plaintiff applied for the Counselor position by submitting an application for employment. Application for Counselor position (Ex. L to Def. Motion); Pl. Sec. Dep. 64.  Plaintiff was first interviewed for the position by a committee of four individuals: Darren Holmes, an African-American male; Jennifer Overholt-Mau, a Caucasian female; Paula Grant, an African-American female; and Jim Ratliff, a Caucasian male.   Interview Schedule (Ex. M to Def. Motion).[1]

Plaintiff was described as "overwhelming" by an interviewer, but she received ratings ranging from good to outstanding and was recommended for a second interview with Greg Thompson, Associate Vice President for Student Affairs.  Interview forms for Plaintiff (Ex. N to

---

[1]Plaintiff admits to being late for this interview because she had a class to teach prior to the interview and had to drive to a different campus for the interview.  Pl. Sec. Dep. 67-70.  She explains that she called ahead to inform the interview panel that she would be approximately ten minutes late and they indicated it was fine.  Id.

Def. Motion); Pl. Sec. Dep. 67. Tara Kratzer, who also applied for the Counselor position, was also recommended for a second interview. Kratzer Application (Ex. O to Def. Motion); Interview Forms for Kratzer (Ex. P to Def. Motion). Thompson's summary of the final candidates noted several weaknesses with Plaintiff's experience and her second interview. Thompson Interview Summary (Ex. Q to Def. Motion). However, Ms. Kratzer's experience was highlighted by Mr. Thompson. Ms. Kratzer was ultimately hired for the Coordinator position. Id.

Plaintiff filed a charge of discrimination with the South Carolina Human Affairs Commission (SCHAC) on September 15, 2009, alleging she was not hired for the Coordinator and Counselor positions because of her race and age. Pl. Dep. 84-86. Despite Plaintiff not being hired for the Coordinator or Counselor positions, the College continued to employ Plaintiff as an adjunct instructor with the College. During the course of Plaintiff's employment, the College had several concerns regarding Plaintiff's performance, including tardiness, student complaints, and poor evaluations. St. Jean Statement (Ex. R to Def. Motion); Vernon Statement (Ex. S to Def. Statement); Email dated 10/1/09 Regarding Student Complaint (Ex. T to Def. Motion); Tutor Evaluation (Ex. U to Def. Motion); Student Evaluations (Ex. V to Def. Motion); M. Williams Dep. 15-16. When Plaintiff's immediate supervisor, Alyssa Johnson, attempted to discuss a student complaint with Plaintiff in Fall 2009, Plaintiff became upset, appeared paranoid, and accused people at the College of setting her up to drive her out. Johnson Statement (Ex. W to Def. Motion); Pl. Dep. 240. Thereafter, Johnson conducted a faculty observation of Plaintiff's teaching, in accordance with College policy. Faculty Instructional Observation (Ex. X to Def. Motion); Policy 8.2.2 and Procedure 8.2.2.1 (Ex. Y to Def. Motion). Johnson noted that Plaintiff did not begin and end class on time; her instruction was not organized; and she did not communicate the lesson effectively. Student evaluations also indicated concern regarding Plaintiff's tardiness and poor use of class time.

-4-

Student Evaluations (Ex. V to Def. Motion). College procedures require that all classes meet for the required number of hours that the course is scheduled, and instructors must adhere to the beginning and ending of class times.  College Policy 8.1.10 and Procedure 8.1.10.1 (Ex. Z to Def. Motion).

Given the complaints and evaluation results, Johnson contacted Plaintiff to schedule a meeting to discuss the College's concerns.    Johnson 2nd Statement (Ex. AA to Def. Motion). Johnson was unsuccessful in her attempts to contact Plaintiff, via telephone and electronic mail, over the course of two days, so Johnson decided to approach Plaintiff outside of her classroom on October 29, 2009, to quickly discuss whether she could meet with her supervisors at 4:30 p.m. on that day. Id.  Plaintiff arrived late to class that day and insisted upon knowing why she needed to meet with her supervisors. Johnson explained that meetings are held with all faculty to discuss observations; however, Plaintiff became defensive and insisted that she bring a witness to the meeting.  Pl. Dep. 258. Eventually, Plaintiff proposed a different time to meet with her supervisors – 3:30 p.m. on October 29, 2009. Johnson 2nd Statement.  However, Plaintiff had a class at that time that was not scheduled to end until 4:15 p.m.  Johnson 2nd Statement.  Michael Williams, former Chair of the English Department, emailed Plaintiff to discuss the concern regarding ending her class early, and the need to meet on November 3, 2009.  Williams 10/30/09 Email (Ex. BB to Def. Motion). Later that day, a telephone conference was held between Plaintiff; Dr. Marilyn Fore, Senior Vice President for Academic Affairs; and Judy Hardee, Assistant Vice President of Human Resources and Employee Relations.  Notes of Telephone Conference (Ex. CC to Def. Motion). Dr. Fore explained the chain of command, and that the type of meeting requested was not out of the ordinary for adjunct instructors. During the telephone conference, Plaintiff continued to insist that she have a witness/attorney present during any meeting to discuss the performance of her job. In an attempt to appease Plaintiff, Dr. Fore told Plaintiff that HR could be present or Plaintiff could have a tape

recorder.  Plaintiff kept mentioning her charge of discrimination with SCHAC, stated that she did not trust them because they had lied to her, and continued to demand that she be allowed to bring a witness to the meeting.  Id.; Pl. Dep. 261.

Due to the Plaintiff's conduct, the College believed that a meeting with Plaintiff would no longer be productive and that it was in the best interests of the students and the College to end the employment relationship. Notes of Telephone Conference.  When the College attempted to mail the termination letter to Plaintiff, she refused to accept the delivery.  Pl. Dep. 290. Therefore, the Dean, Dr. Butler, went to Plaintiff's class the morning of November 3, 2009, to attempt to give her the letter.  Plaintiff still refused to talk with any supervising personnel from the College without a witness and would not accept the letter.  Butler Notes (Ex. DD to Def. Motion). As such, Dr. Butler verbally informed Plaintiff that her employment was terminated. Plaintiff never accepted the letter from Dr. Butler, which contained the reasons for the termination of her employment.  Termination Letter (Ex. EE to Def. Motion); Pl. Dep. 299-301.

Following the termination, Plaintiff amended her charge of discrimination to include allegations that her employment was terminated because of her race and age, and in retaliation for filing her initial charge in September 2009.  Charge of Discrimination (Ex. FF to Def. Motion). SCHAC issued a Notice of Right to Sue on September 27, 2010.  Notice of Right to Sue (Ex. GG to Def. Motion). On February 22, 2011, Plaintiff filed the instant action.

## III.    STANDARD OF REVIEW

The moving party bears the burden of showing that summary judgment is proper.  Summary judgment is proper if there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  Summary judgment is proper if the non-moving party fails to establish an essential element of any

cause of action upon which the non-moving party has the burden of proof.  Celotex, 477 U.S. 317.
Once the moving party has brought into question whether there is a genuine dispute for trial on a
material element of the non-moving party's claims, the non-moving party bears the burden of coming
forward with specific facts which show a genuine dispute for trial.  Fed.R.Civ.P. 56(e); Matsushita
Electrical Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574 (1986).  The non-moving party
must come forward with enough evidence, beyond a mere scintilla, upon which the fact finder could
reasonably find for it.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).  The facts and
inferences to be drawn therefrom must be viewed in the light most favorable to the non-moving
party.  Shealy v. Winston, 929 F.2d 1009, 1011 (4th Cir. 1991).  However, the non-moving party may
not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary
judgment.  Barber v. Hosp. Corp. of Am., 977 F.2d 874-75 (4th Cir. 1992).  The evidence relied on
must meet "the substantive evidentiary standard of proof that would apply at a trial on the merits."
Mitchell v. Data General Corp., 12 F.3d 1310, 1316 (4th Cir. 1993).

        To show that a genuine dispute of material fact exists, a party may not rest upon the mere
allegations or denials of his pleadings.  See Celotex, 477 U.S. at 324.  Rather, the party must present
evidence supporting his or her position by "citing to particular parts of materials in the record,
including depositions, documents, electronically stored information, affidavits or declarations,
stipulations (including those made for purposes of the motion only), admissions, interrogatory
answers, or other materials."  Fed.R.Civ.P. 56(c)(1)(A); see also Cray Communications, Inc. v.
Novatel Computer Systems, Inc., 33 F.3d 390 (4th Cir. 1994); Orsi v. Kickwood, 999 F.2d 86 (4th Cir.
1993); Local Rules 7.04, 7.05, D.S.C.

IV.    **DISCUSSION**

A.    **Eleventh Amendment Immunity**

Defendant argues that Plaintiff's claim for monetary damages under the ADEA should be dismissed because the College is a state agency entitled to Eleventh Amendment Immunity and the ADEA has not abrogated the state's immunity from suits by private individuals.  The Eleventh Amendment states that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const., Amend. XI. Accordingly, the Constitution does not provide for federal jurisdiction over suits against nonconsenting States, unless the state's eleventh amendment immunity has been abrogated by Congress.  Kimel v. Florida Bd. of Regents, 528 U.S. 62, 73 (2000) (quoting Dellmuth v. Muth, 491 U.S. 223, 228, 109 S.Ct. 2397, 105 L.Ed.2d 181 (1989); Atascadero State Hospital v. Scanlon, 473 U.S. 234, 242, 105 S.Ct. 3142, 87 L.Ed.2d 171 (1985) ("Congress may abrogate the States' constitutionally secured immunity from suit in federal court only by making its intention unmistakably clear in the language of the statute.").  Congress did not exercise its power to abrogate a state's Eleventh Amendment immunity in enacting the ADEA. Kimel v. Florida Bd. of Regents, 528 U.S. 62, 91, 120 S.Ct. 631, 145 L.Ed.2d 522 (2000).

Also, Defendant is part of the State Board for Technical and Comprehensive Education, which is "a continuing body and agency and instrumentality of the State,"  S.C. Code Ann. § 59-53-10, and it satisfies the test announced in Ram Ditta v. Md. Nat'l Capital Park & Planning Comm'n, 822 F.2d 456 (4th Cir. 1987), to determine whether a governmental entity is an "arm of the state" under the Eleventh Amendment. The factors outlined in Ram Ditta include, but are not limited to, (1) whether the state treasury will be responsible for paying any judgment that might be awarded;

(2) whether the entity exercises a significant degree of autonomy from the state; (3) whether it is involved with local versus statewide concerns; and (4) how it is treated as a matter of state law. Id. at 457-58.  In this case, the state treasury will be called upon to pay a judgment if Plaintiff prevails, as funds will derive from state dollars. S.C. Code Ann. § 59-53-820. Defendant does not exercise a significant degree of autonomy from the State, because the members of the State Board for Technical and Comprehensive Education are appointed by the Governor, and the State Superintendent of Education and the Secretary of Commerce are ex-officio members. Further, members of Defendant's Commission are also appointed by the Governor, and include individuals recommended by the area legislative delegation. S.C. Code Ann. § 59-53-810. Finally, Defendant is involved in statewide concerns, that being higher education, and is a part of a state agency by statute. See Greer v. Univ. of S.C., No. 3:10-1390-MBS-JRM, 2012 WL 405773, *4 (D.S.C. Jan. 20, 2012).

For these reasons, Plaintiff's claim for monetary relief[2] under the ADEA is barred by the Eleventh Amendment.

## B.    Discrimination Claims

Plaintiff alleges that Defendant discriminated against her based upon her race in violation of Title VII and her age in violation of the ADEA.  Specifically, Plaintiff alleges that Defendant discriminated against her based upon her race and age by failing to promote her to two positions, reducing the number of classes she was scheduled to teach, transferring her to a different campus, and terminating her employment.

Title VII makes it "an unlawful employment practice for an employer-(1) to fail or refuse to

---

[2]Plaintiff also seeks injunctive relief and, thus, the merits of her claim under the ADEA are discussed below.

hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin...." 42 U.S.C. § 2000e–2(a)(1).  The ADEA makes it unlawful for an employer to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age. 29 U.S.C. § 623(a)(1).

In the absence of direct evidence of discrimination, courts apply the burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)[3] for claims pursuant to both Title VII and the ADEA.   Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 285 (4th Cir.2004).[4]  Under the analysis set forth in McDonnell Douglas, Plaintiff has the initial burden of demonstrating a prima facie case of discrimination. Bryant v. Bell Atlantic Maryland, Inc., 288 F.3d 124, 133 (4th Cir. 2002).

If Plaintiff establishes a prima facie case, the burden shifts to Defendant to produce a legitimate, nondiscriminatory reason for the adverse action.  Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 254 (1981).  This is merely a burden of production, not of persuasion.  St. Mary's Honor Center v. Hicks, 509 U.S. 502, 506 (1993).

---

[3] The McDonnell Douglas analysis was refined in St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993), and Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

[4] The Supreme Court has noted that it "has not definitively decided" whether the McDonnell Douglas framework, first developed in the context of Title VII cases, "is appropriate in the ADEA context." Gross v. FBL Financial Services, Inc., --- U.S. ----, 129 S.Ct. 2343, 2349 n.2, 174 L.Ed.2d 119 (2009). In the absence of further direction from the Supreme Court, the undersigned must follow Fourth Circuit precedent, which applies the McDonnell Douglas framework to ADEA claims. See Hill, 354 F.3d at 285; see also Bodkin v. Town of Strasburg, 2010 WL 2640461 at *4-5 (4th Cir. June 29, 2010) (continuing to apply the McDonnell Douglas framework following the Gross opinion).

-10-

Once Defendant has met its burden of production by producing its legitimate, nondiscriminatory reason, the sole remaining issue is "discrimination <u>vel non</u>." <u>Reeves v. Sanderson Plumbing Products, Inc.</u>, 530 U.S. 133, 143 (2000)(citing <u>Postal Service Bd. of Governors v. Aikens</u>, 460 U.S. 711, 716 (1983)). In other words, the burden shifts back to Plaintiff to demonstrate by a preponderance of the evidence that the legitimate reason produced by Defendant is not its true reason, but was pretext for discrimination. <u>Reeves</u>, 530 U.S. at 143.

### 1.    Promotion Claims

Plaintiff alleges that Defendant failed to promote her to two positions, the SSTC Coordinator position and the Counselor position, in violation of Title VII and the ADEA. To prove a <u>prima facie</u> case of discrimination for failure to promote, a plaintiff must prove that (1) she is a member of a protected group; (2) she applied for the position in question; (3) she was qualified for the position; and (4) she was rejected for the position under circumstances giving rise to an inference of unlawful discrimination. <u>Anderson v. Westinghouse Savannah River Company</u>, 406 F.3d 248, 268 (4th Cir.2005).

With both of the promotions at issue, the only question before the court at the <u>prima facie</u> stage is whether Plaintiff was qualified for the positions. She is a member of both race and age protected classes, she applied for the positions, and the positions were given to younger, white individuals, which is sufficient at the <u>prima facie</u> stage to give rise to an inference of discrimination. <u>Carter v. Ball</u>, 33 F.3d 450, 458 (4th Cir.1994).

With respect to the SSTC Coordinator position, Defendant concedes that, on paper, Plaintiff was qualified. The minimum qualifications for the position were a "Bachelor's degree in English, Communications or related field" and "excellent customer service and communication skills." The Coordinator position also required "computer and Microsoft Office 2007 proficiency," as well as

"strong organizational skills." <u>See</u> Coordinator Posting. However, the two individuals who interviewed Plaintiff for the position noted during the interview that Plaintiff "did not answer questions on target," "strayed away a lot," provided "scatter brained[5] responses" and that "coordination of services could be difficult for her personality type." One interviewer also noted that she was unable to ask Plaintiff questions because Plaintiff began talking before any questions were asked. <u>See</u> Interview Questions. In addition, during the interview, Plaintiff admitted that she was not very familiar with Microsoft 2007, and she was unable to complete a timed technology assessment given at the end of the interview. <u>Id.</u> and Assessment Direction and Plaintiff Results. Out of the twelve tasks given on the assessment, Plaintiff was only able to complete four within the time given. <u>Id.</u> <u>See also</u> Pl. Sec. Dep. 46-47. Thus, based upon the minimum requirements posted for the Coordinator position, Plaintiff was not qualified because she was not proficient in Microsoft 2007 and, during her interview, failed to demonstrate excellent communication skills or strong organizational skills. As such, Plaintiff fails to establish a <u>prima</u> <u>facie</u> case of race or age discrimination.

Even assuming Plaintiff could establish a <u>prima</u> <u>facie</u> case of discrimination, Defendant has presented a legitimate, non-discriminatory reason for failing to promote Plaintiff to the Coordinator position and Plaintiff fails to show that the reason is pretext for discrimination.

The individual who was hired for the position, Ms. Shegog, had a Bachelor's degree in English and approximately eight years of customer service experience. Shegog Application. She was also working towards earning her Master's degree in English. <u>Id.</u> Shegog also received higher

---

[5]Plaintiff asserts in her Response that the use of this phrase, "scatter brained," was racist. She also made this claim in her deposition, but when asked to explain how the use of this phrase indicated that the promotion decision was based on race or age, Plaintiff responded that "[i]t may not have been. I didn't say that it was. I'm saying how unprofessional [Riddei] is. I'm – I'm only telling you that to indicate how unprofessional she is." Pl. Sec. Dep. 54-55.

scores from the interviewers than Plaintiff.  Shegog Interview Feedback Forms.  She was also able to complete the timed technology assessment in less time than that allotted for completion.  Shegog Assessment Results.  Thus, Defendant found Shegog to be the applicant best qualified for the position and hired her instead of Plaintiff.

Plaintiff argues that Shegog was less experienced and less qualified than her.  Indeed, it appears Plaintiff had more teaching experience than Shegog and held a Master's degree in Education, unlike Shegog, who was working towards a Master's degree.  However, neither of these qualifications were required for the Coordinator position, and, of the qualifications required, the interviewers found that Plaintiff was unable to demonstrate a proficiency in those areas, while Shegog was.  "In a suit alleging failure to promote, a plaintiff seeking to rebut an employer's reliance on inferior job qualifications cannot simply compare herself to other employees on the basis of a single evaluative factor artificially severed from the employer's focus on multiple factors in combination."Hux v. City of Newport News, Va., 451 F.3d 311, 312 (4th Cir. 2006).  Additionally, employers are not required to promote the applicant who has attained the highest educational level.  Anderson, 406 F.3d at 269-70.  Furthermore, "[i]t is not within our authority to dictate the factors that employers must weigh in making a promotion, and we see nothing in Title VII to indicate that Congress wished to require companies to disregard the successful personal interactions that make for a productive workplace." Hux, 451 F.3d at 318; accord Amirmokri v. Balt. Gas & Elec. Co., 60 F.3d 1126, 1130 (4th Cir. 1995) (affirming summary judgment for the employer); see also Johnson v. Midlands Tech. College Foundation, No. 3:08-803-JFA-PJG, 2009 WL 3063048, at *5 (D.S.C. Sept. 21, 2009) (supervisor selected employee "based on his personal interactions with her, where he found her to be 'courteous, professional, competent and knowledgeable across a broad range of the College's policies and procedures' and that she possessed the 'poise and experience to succeed

in the job'"). In sum, courts do not sit as "super personnel departments second guessing an employer's perceptions of an employee's qualifications." Malghan v. Evans, 118 Fed. Appx. 731 (4th Cir.2004) (citing Smith v. Univ. of N.C., 632 F.2d 316, 346 (4th Ci r.1980)). Plaintiff fails to show that Defendant's reason for failing to promote her to the Coordinator position was pretext for a discriminatory reason, and, thus, summary judgment is appropriate as to this claim.

The posting for the second position for which Plaintiff applied, the Counselor position, set forth one minimum requirement, "Master's degree," and two preferred requirements, "Masters degree in Counseling, Student Personnel Administration, Social Work or closely related field with significant coursework in counseling preferred. Two years progressively responsible work experience in a secondary or college/university setting preferred." Counselor Posting. Plaintiff had a Master's degree, although not in one of the preferred fields. She did not have two years of progressively responsible experience in a secondary or college/university setting. Plaintiff interviewed for the position and received ratings from good to outstanding from the four interviewers. Interview Forms for Plaintiff. She then received a second interview with the Associate Vice President for Student Affairs, Greg Thompson, who noted in his interview summary that Plaintiff displayed distracting mannerisms, lacked focus and clear responses to questions, had limited direct experience in a counseling/advising setting, and had primarily worked with elementary-age students. He also questioned the applicability of her degree in Education to the position.[6] Thompson Interview Summary. Nevertheless, because Plaintiff's burden at this stage is not an onerous one, see Texas Dep't of Community Affairs, 450 U.S. at 253, she has presented sufficient evidence to show that she was qualified for the position by meeting the minimum requirement for the Counselor position, that

_____

[6]Thompson also noted that Plaintiff arrived more than fifteen minutes late for her interview, but Plaintiff disputes this. Pl. Sec. Dep. 68.

is, holding a Master's degree, and receiving good to outstanding ratings on her first interview.

As its legitimate, nondiscriminatory reason for failing to hire Plaintiff for the Counselor position, Defendant submits that one of the other applicants was better qualified for the position. Ms. Kratzer met the minimum and the preferred requirements for the position: she held a Master's degree in Social Work and had over four years of experience working with middle and high school students, two years of which was in a secondary school setting. She was also working towards a certification in Career Counseling. In addition, during her second interview, Thompson noted that her education and experience were directly applicable to the position.

Plaintiff admits in her Response that "the selection of Tara Kratzer might have had some weight based upon her credentials," but "the fact that [Defendant] had determined that Plaintiff would not be hired for that position before Plaintiff was even interviewed, discredits the validity of [Defendant's] selection of Kratzer" for the position. Pl. Response p. 2. However, Plaintiff points to no evidence that anyone decided not to hire Plaintiff for the Counselor position prior to interviewing her. Even if this was true, Plaintiff fails to show that the decision was made based on her age or race. In sum, it is undisputed that Kratzer was more qualified for the Counselor position than Plaintiff because she met both the minimum and all the preferred qualifications for the position while Plaintiff only met the minimum qualification of holding a Master's degree. Plaintiff has failed to point to evidence that this reason for hiring Kratzer over Plaintiff for the Counselor position was actually pretext for a discriminatory reason. Accordingly, summary judgment is appropriate on this claim as well.

### 2.     Reduction in Classes and Transfer Claims

Plaintiff also argues that she "was dismissed from teaching five classes . . . to zero classes and "was transferred from the Georgetown campus to the Conway campus" because of her race and

age.  To establish a <u>prima facie</u> case of discrimination in disparate treatment claims such as these, Plaintiff must show (1) that she is a member of a protected class; (2) that she was performing her job satisfactorily; (3) that she was subjected to an adverse employment action; and (4) that other employees who were not members of her protected class were treated more favorably, or there is some other evidence giving rise to an inference of unlawful discrimination.  See <u>Coleman v. Md. Ct. of App.</u>, 626 F.3d 187, 190 (4th Cir.2010).

Defendant argues that Plaintiff fails to show that she suffered an adverse employment action with respect to either of these claims.  "An adverse employment action is a discriminatory act which adversely affects the terms, conditions, or benefits of the plaintiff's employment." <u>James v. Booz-Allen & Hamilton, Inc.</u>, 368 F.3d 371, 375–76 (4th Cir.2004). "A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." <u>Burlington Indus., Inc. v. Ellerth</u>, 524 U.S. 742, 761, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998).

With respect to the reduction in courses, Plaintiff alleges that, in June of 2009, she noticed that certain courses that were previously assigned to her had been removed from the tentative schedule for the Fall 2009 semester.  However, it is undisputed that Plaintiff was hired on a semester-to-semester basis and, at the time she noticed the changes to the tentative Fall 2009 schedule, she had not yet entered into a contract for that semester.  <u>See</u> Requests to Admit and Plaintiff Responses (Ex. JJ to Def. Motion); Pl. Dep. 191; Pl. Sec. Dep. 81-83, 88-89.  In addition, Plaintiff ultimately was scheduled to and did teach classes during the Fall 2009 semester.  <u>See</u> Requests to Admit and Plaintiff Responses; Pl. Dep. 220; Pl. Sec. Dep. 86-88.  She initially signed a contract to teach four classes, but she withdrew from one of the classes because it was at the Myrtle

Beach Campus and she felt it was too far of a drive. See Appointment Letters; Pl. Dep. 221. Thus, for the Fall 2009 semester, Plaintiff taught three courses, which was consistent with the number of courses she taught the previous two semesters. See Appointment Letters (showing that Plaintiff taught three classes in the Spring 2009 semester and two classes in the Summer 2009 semester). Therefore, because Plaintiff had not yet entered into a contract for the Fall 2009 semester and because she fails to show that she suffered any significant change in benefits, she fails to establish that she suffered an adverse employment action when courses that were tentatively scheduled for that semester were changed. As such, Plaintiff fails to present sufficient evidence to establish a prima facie case with respect to this claim.

        Plaintiff also argues that Defendant's decision to transfer the location where she would teach classes was based upon her race and age. Plaintiff was an adjunct faculty member, and the Adjunct Faculty Job Description provides that such employees will "[t]each courses at assigned times and locations to include all College campuses . . . ." See Adjunct Faculty Job Description. A mere change in an employee's job assignment, even if "less appealing to the employee, ... does not constitute adverse employment action." Booz–Allen, 368 F.3d at 376. Plaintiff fails to point to evidence that her assignment to teach classes at the Conway campus resulted in any decrease in compensation, job title, level of responsibility, opportunity for promotion or that it had any other significant detrimental effect. Thus, she fails to show that she suffered an adverse employment action, and, consequently, fails to establish a prima facie case of discrimination.

        3.    Termination

        Plaintiff also alleges that she was terminated because of her race and age. To establish a prima facie case of discrimination in termination, Plaintiff must show To establish a prima facie case of race discrimination in a termination case, the plaintiff must present facts showing that (1) she is

-17-

a member of a protected class; (2) she suffered adverse employment action; (3) she was performing her job duties at a level that met her employer's legitimate expectations at the time of the adverse employment action; and (4) the position remained open or was filled by similarly qualified applicants outside the protected class. Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F. 3rd 277, 285 (4th Cir.2004). The fourth element can also be established by presenting evidence raising an inference of discrimination. See Miles v. Dell, Inc., 429 F.3d 480, 486–87 (4th Cir.2005); EEOC v. Sears Roebuck & Co., 243 F.3d 846, 851 n. 2 (4th Cir.2001) (citing Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)). Defendant argues that Plaintiff was not performing her duties at a level that met her employer's legitimate expectations at the time of her termination. Prior to Plaintiff's termination, Defendant had received complaints from students and unfavorable student evaluations regarding Plaintiff's performance and Defendant felt Plaintiff evidenced an unwillingness to cooperate with its efforts to assist in improving her performance.

Specifically, students complained about Plaintiff's classroom management, her tardiness and her lack of focus during class. St. Jean Statement. Plaintiff's overall rating from her students on her evaluations was 68%. The students' main complaints regarded Plaintiff's inappropriate use of class time.[7] When Johnson performed a classroom evaluation of Plaintiff, she noted that Plaintiff did not begin or end on time, her instruction was not organized or consistent with course outcomes and she did not communicate effectively. Faculty Instructional Observation (Ex. X to Def. Motion).

Plaintiff argues that she had above average student evaluations and that Defendant used incomplete data during the Fall 2009 term to reach her overall ratings, however, she fails to point

---

[7]Student comments include "always comes to class very unorganized," "often takes up class time talking about things that do not pertain directly to class," "I feel time could be better utilized," "[Plaintiff] always wants to talk about her son," "for 45 minutes she talks about nothing." Student Evaluation Forms (Ex. V to Def. Motion).

to evidence to support the contention that Defendant used incomplete data.[8]   She also argues that Defendant "manufactured evidence [it] did not have and covered up damning evidence against [itself] that [it] found detrimental."  Again, she fails to point to evidence in support of this argument. Plaintiff also argues that she was never written up, reprimanded or even made aware of any deficiencies prior to her filing her Charge of Discrimination on September 15, 2009.  However, the relevant time to evaluate an employee's performance is at the time of the adverse action. See, e.g., Miles v. Dell, Inc., 429 F.3d 480, 485 (4th Cir. 2005) (stating that the third factor of a prima facie case includes that "she was performing her job duties at a level that met her employer's legitimate expectations at the time of the adverse employment action").

Based upon the evidence presented, Plaintiff fails to show that she was performing her job duties at a level that met her employer's legitimate expectations at the time of the adverse employment action.  Accordingly, summary judgment is appropriate on Plaintiff's claim that she was terminated because of her race and/or age.

## C.     Retaliation

Finally, Plaintiff argues that she was terminated in retaliation for the Charge of Discrimination she filed in September of 2009.  Both the ADEA and Title VII make it an "unlawful

---

[8]Along with her Response in opposition to the Motion for Summary Judgment, Plaintiff submitted over 400 pages of documents.  However, in her three-page response, she fails to cite to any of the evidence she submitted other than to say "based upon the above mentioned violations and the documentation provided in this file, I, Sharon Brown Williams, beseech this Court to deny Defendant's Motion for Summary Judgment."  Response p. 3.  Rule 56(c), Fed.R.Civ.P., provides that a party asserting that a fact is genuinely disputed must support the assertion by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."  It is not the court's responsibility to comb the record to discover facts supporting Plaintiff's arguments. See Malina v. Baltimore Gas & Elec. Co., 18 F.Supp.2d 596, 604 (D.Md.1998) ("[I]t is the responsibility of the plaintiff, not the court, to identify with particularity the evidentiary facts existing in the record which can oppose the defendant's summary judgment motion. The court ... is not required to independently comb the record to look for them.").

employment practice for an employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e–3(a) (Title VII); 29 U.S.C. 623(d) (ADEA).

To establish a prima facie case of retaliation under Title VII or the ADEA, a plaintiff must show (1) he engaged in protected activity, (2) the employer took adverse employment action against him, and (3) a causal connection existed between the protected activity and the adverse action. Ross v. Communications Satellite Corp., 759 F.2d 355, 365 (4th Cir.1985); Laughlin v. Metropolitan Washington Airports Authority, 149 F.3d 253, 258 (4th Cir.1998); Causey v. Balog, 162 F.3d 795, 803 (4th Cir.1998). If Plaintiff establishes a prima facie case, Defendant can rebut the presumption of retaliation by articulating a non-retaliatory reason for its actions. At that point, Plaintiff must present evidence sufficient to create a genuine issue of material fact that Defendant's legitimate, non-retaliatory reason is pretextual. See Matvia v. Bald Head Island Management, 259 F.3d 261, 271 (4th Cir.2001).

Plaintiff meets each of the requirements for a prima facie case of retaliation. She engaged in protected activity when she filed a Charge of Discrimination, she suffered an adverse employment action when she was terminated and a causal connection exists between the two events due to the closeness in time between the two events. Williams v. Cerberonics, Inc., 871 F.2d 452, 457 (4th Cir.1989) (holding that a causal connection can be established based on temporal proximity alone). However, Defendant has presented a legitimate, non-retaliatory reason for Plaintiff's termination in that her job performance was lacking and, when Plaintiff's supervisors attempted to speak with her about it, she attempted to evade their attempts and evidenced an unwillingness to cooperate with their efforts to assist in improving her performance.

As stated above, students complained about Plaintiff's classroom management, her tardiness and her lack of focus during class. St. Jean Statement. Plaintiff's overall rating from her students on her evaluations was 68%. The students' main complaints regarded Plaintiff's tardiness and inappropriate use of class time. Further, when Plaintiff's supervisor, Alyssa Johnson, performed a classroom evaluation of Plaintiff, she noted that Plaintiff did not begin or end on time, her instruction was not organized or consistent with course outcomes and she did not communicate effectively.

In the Fall of 2009, Johnson contacted Plaintiff to discuss a student complaint. Plaintiff became upset, appeared paranoid, and accused people at the College of setting her up to drive her out. Johnson Statement. Later, when Johnson attempted to contact Plaintiff to discuss her observation and the student evaluations in accordance with school policy ("all supervisor's observations and student evaluation reports shall be communicated promptly to the instructor," see Policy 8.2.2 and Peocedure 8.2.2.1), she was unable to get in touch with Plaintiff over the course of two days via telephone or email. Thus, Johnson met Plaintiff outside her class, and Johnson noted that Plaintiff was again late for that class. Johnson found Plaintiff to be defensive when she told her why she wanted to meet with her and Plaintiff insisted that she bring a witness to the meeting. When she agreed to the meeting, Plaintiff suggested a meeting time that fell within one of her class times. Specifically, Plaintiff proposed a meeting time at 3:30 pm, when her class was not scheduled to end until 4:15 pm.[9] Mr. Williams, Academic Chair, emailed Plaintiff to discuss the concern regarding ending her class early, and the need to meet on November 3, 2009. Williams 10/30/09 Email (Ex.

---

[9]Plaintiff asserts that she was giving a test in that class on that day and knew that the students would finish with the test within thirty minutes to one hour. Pl. Dep. 273, 277, 279, 282. However, College procedure required the full class time to be utilized and that a change in class time must be approved by the department chair. See Policy 8.1.10 and Procedure 8.1.10.1. Plaintiff admitted that she did give a time that was normally during a class, "and maybe that wasn't the best planning, okay, but I thought it was all right, okay. Maybe it wasn't the best idea." Pl. Dep. 279.

BB to Def. Motion).

Later that day, a telephone conference was held between Plaintiff; Dr. Marilyn Fore, Senior Vice President for Academic Affairs; and Judy Hardee, Assistant Vice President of Human Resources and Employee Relations. Notes of Telephone Conference (Ex. CC to Def. Motion). Dr. Fore explained the chain of command, and that the type of meeting requested was not out of the ordinary for adjunct instructors.  Id.  During the telephone conference, Plaintiff continued to insist that she have a witness/attorney present.[10] Dr. Fore told Plaintiff that HR could be present or she could have a tape recorder. Plaintiff mentioned her Charge of Discrimination and stated that she did not trust them because they had lied to her.  Id.; Pl. Dep. 261.

Following Plaintiff's behavior with Johnson when she met with her outside of her class, and then her conduct during the telephone conference, Defendant concluded that a meeting with Plaintiff would no longer be productive and that it was in the best interests of the students and Defendant to end the employment relationship with Plaintiff.  See Notes of Telephone Conference. When Defendant attempted to mail the termination letter to Plaintiff, she refused to accept the delivery. Pl. Dep. 290. When Dr. Butler went to Plaintiff's class the morning of November 3, 2009, to attempt to give her the letter, Williams still refused to talk with Dr. Butler without a witness and would not

---

[10]When asked during her deposition why she refused to meet without a witness, Plaintiff testified:

> A: I asked that I have a witness present. Because at this point, here it is October 2009, South Carolina is a state that's been known for lynchings, and this is the South, okay. And so it was not my -- in my better judgment . . . So why would I go to a meeting without a witness.
> . . .
> A: I was not going to have one of these three-on-one meetings where they come down on me and when I leave the meeting all these stories run rampant about how out of control I was, how this, that and the other.
> Q: Had you had one of those before?
> A: No, not to my knowledge.

Pl. Dep. 259, 261.

-22-

accept the letter. See Butler Notes (Ex. DD to Def. Motion); Pl. Dep. 295, 297.

To establish pretext, Plaintiff argues, as mentioned above, that she was never written up, reprimanded, or even made aware of any deficiencies before she filed her Charge of Discrimination and that Defendant manipulated evidence. However, she does not present evidence to show that Defendant manipulated evidence. In addition, she does not dispute her evasive conduct with respect to Johnson's attempts to contact her to discuss evaluations or her confrontational attitude during the telephone conference. In sum, it is Plaintiff's burden ultimately to show that illegal retaliation was the motivating factor for her termination. It is not necessary for this court to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for Defendant's decision. Hawkins v. Pepsico, 203 F.3d 274, 279 (4th Cir.2000).[11] Plaintiff must show a reasonable jury could believe her explanation of intentional retaliation. Id. Plaintiff has failed refute Defendant's legitimate, non-retaliatory reason for her adverse employment action and failed to meet her burden of creating a genuine dispute of material fact as to whether her termination was in retaliation for her Charge of Discrimination, and no reasonable juror could conclude as much. Therefore, summary judgment is appropriate on her retaliation claim as well.

### D.     State Law Claims

If the district judge accepts this Report and Recommendation, the original federal jurisdiction claims will be dismissed and the only remaining claim will be Plaintiff's state law claims. Title 28 U.S.C. § 1367(c)(3) provides, in pertinent part, "[t]he district courts may decline to exercise supplemental jurisdiction over a claim ... if ... the district court has dismissed all claims over

---

[11]"Proof that the employer's proffered reasons are unpersuasive, or even obviously contrived, ... does not necessarily establish that [Plaintiff's] proffered reason is correct. Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133 at 146–47, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

which it has original jurisdiction ...." The Fourth Circuit has recognized that "trial courts enjoy wide latitude in determining whether or not to retain jurisdiction over state claims when all federal claims have been extinguished." <u>Shanaghan v. Cahill</u>, 58 F.3d 106, 110 (4th Cir.1995) (holding district court did not abuse its discretion in declining to retain jurisdiction over the state law claims). <u>See also</u>, <u>e.g.</u>, <u>United Mine Workers of Am. v. Gibbs</u>, 383 U.S. 715, 726–27, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); <u>Revene v. Charles County Comm'rs</u>, 882 F.2d 870, 875 (4th Cir.1989). Therefore, the undersigned recommends that the district judge decline to retain jurisdiction over Plaintiff's state law claims.

## V.    CONCLUSION

For the reasons discussed above, it is recommended that Defendant's Motion for Summary Judgment (Document # 91) be granted as to Plaintiff's claims of discrimination and retaliation under Title VII and the ADEA, the court decline to exercise jurisdiction over Plaintiff's state law claims, and the case be dismissed in its entirety.

 s/Thomas E. Rogers, III
Thomas E. Rogers, III
United States Magistrate Judge

February 6, 2014
Florence, South Carolina

**The parties are directed to the important information on the following page.**